# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

ALLY FINANCIAL INC v STATE TREASURER
SANTANDER CONSUMER USA INC v STATE TREASURER

Docket Nos. 154668, 154669, and 154670. Argued on application for leave to appeal January 10, 2018. Decided July 20, 2018.

Ally Financial Inc. (Docket No. 154668) and Santander Consumer USA Inc. (Docket Nos. 154669 and 154670) (collectively, plaintiffs) brought separate actions in the Court of Claims against the State Treasurer, the State of Michigan, and the Department of Treasury (the department), seeking refunds under the bad-debt statute, MCL 205.54i, for taxes paid on vehicles financed through installment contracts. Santander's predecessor in interest and Ally entered into financing agreements with various automobile dealerships under which an automobile purchaser entered into an installment contract with the dealership and the dealership financed the purchase price and the sales tax and remitted that tax to the state. Plaintiffs in turn paid the particular dealership the purchase price and sales tax, and the dealership assigned the installment contract to plaintiffs, giving plaintiffs the right to collect the assigned installment contract payments and the right to repossess the vehicle if a purchaser defaulted on the contract payment. When plaintiffs determined that certain installment agreements were uncollectable after the automobile purchasers defaulted on their installment contracts, plaintiffs repossessed and resold many of the vehicles for amounts less than the purchasers owed under the individual installment contracts. Each plaintiff wrote off the outstanding balances as bad debts for federal income tax purposes under 26 USC 166, and each plaintiff filed refund requests under MCL 205.54i with the department for the prorated share of the previously paid Michigan sales tax attributable to the bad debts remaining on the delinquent accounts. The department denied plaintiffs' refund requests, reasoning that (1) plaintiffs were not entitled to any refunds for the debts associated with vehicles that were repossessed because MCL 205.54i excludes "repossessed property" from the statute's definition of "bad debt"; (2) plaintiffs failed to support their claims with the required RD-108 forms, and the alternative documentation provided by plaintiffs to support the amount of taxes paid was insufficient; and (3) Ally lacked appropriate election forms designating itself, rather than the various dealerships, as the party entitled to claim the tax refund. The court, MICHAEL J. TALBOT, C.J., agreed with the department's arguments and granted summary disposition in favor of defendants. Plaintiffs each appealed, and the appeals were consolidated. The Court of Appeals, JANSEN, P.J., and K. F. KELLY and O'BRIEN, JJ., affirmed in a published decision. 317 Mich App 316 (2016). The Supreme Court ordered and heard oral argument on whether to grant plaintiffs' applications for leave to appeal or take other action. 500 Mich 1010 (2017).

In a unanimous opinion by Justice VIVIANO, the Supreme Court, in lieu of granting leave to appeal, *held*:

Under MCL 205.54i, retailers and lenders may seek a refund for sales tax paid on gross proceeds that are uncollectible as a bad debt. Repossessed property, which is excluded from the definition of "bad debt" in MCL 205.54i(1)(a), includes only what the taxpayer has collected under an installment contract at the time of the default, that is, the portion of the debt related to the value of the repossessed property. The department therefore erred by interpreting "repossessed property" as meaning the value of the entire attached account before the property was repossessed. The department did not abuse its discretion by requiring plaintiffs to support their claims for tax refunds with validated RD-108 forms, but the department erred by rejecting Ally's election forms.

1. MCL 205.52(1) of the general sales tax act (GSTA), MCL 205.51 *et seq.*, requires retailers to pay a 6% tax on gross sale proceeds, which includes purchases on credit; the sales tax is due at the time of purchase, not when each installment payment is made. MCL 205.54i provides that retailers and lenders may seek a refund for sales tax paid on gross proceeds that are uncollectible as a bad debt. To that end, MCL 205.54i(2) provides that a taxpayer may deduct the amount of bad debts from his or her gross proceeds used for computation of the tax. Under MCL 205.54i(1)(a), the term "bad debt" means any portion of a debt that is related to a sale at retail taxable under the GSTA and that can be claimed as a deduction pursuant to 26 USC 166; the term specifically does not include, among other things, repossessed property. MCL 205.54i(1)(a) and 26 USC 166 both contemplate that a debt can be divisible; the term "repossessed property" encompasses only what the taxpayer has collected—that is, the value of the repossessed property—it does not refer to the entire value of the account before the property was repossessed. By including "repossessed property"—but not the attached account—in the list of exclusions from "bad debt," MCL 205.54i(1)(a) plainly indicates that only the portion of the debt related to the value of the repossessed property is excluded. Reading the other items in MCL 205.54i(1)(a) that are excluded from the definition of "bad debt" together with the excluded "repossessed property," it is also clear that the Legislature did not intend to impose a sales tax on consideration that becomes worthless. Further, § 320 of the Streamlined Sales and Use Tax Agreement (SSUTA), of which Michigan is a member state, further supports this interpretation. The SSUTA contains a list of bad-debt exclusions similar to that of MCL 205.54i(1)(a), which demonstrates that the exclusions are monetary amounts that must be subtracted from bad debt based on the consideration ultimately received; a majority of the other SSUTA member states similarly interpret the bad-debt language in their respective statutes. In this case, the department argued that MCL 205.54i does not permit tax refunds on any debts associated with repossessed property, including the amounts the taxpayer did not recover in a sale made on an installment contract. The Court of Appeals erred by upholding the department's interpretation because "repossessed property" encompasses only that portion of the debt related to the value of the repossessed property, not the value of the entire attached account.

2. MCL 205.54i(4) provides that any claim for a bad-debt deduction under MCL 205.54i must be supported by that evidence required by the department. In that regard, the department requires taxpayers to provide validated RD-108 forms supporting their claims for tax refunds, reasoning that the Secretary of State will only issue that validated form once the sales tax is paid

and that the form therefore provides the best evidence that the sales tax was paid and of the amount that was paid. When an agency is granted discretion by a statute, courts will uphold the agency's exercise of the discretion if it is supported by a rational basis. In this case, the department did not abuse its discretion by requiring plaintiffs to provide validated RD-108 forms supporting their respective claims for tax refunds. Except in certain circumstances, plaintiffs failed to provide RD-108 forms, and the internal records provided by plaintiffs did not establish that the taxes were actually remitted. Accordingly, because plaintiffs failed to establish that there was no rational basis for the department's requirement that RD-108 forms accompany any tax-refund request under MCL 205.54i, the Court of Appeals correctly upheld the department's decision to require those forms.

3. MCL 205.54i(1)(e) provides that bad-debt refunds may be claimed by a taxpayer, defined as a retailer who remitted the sales tax to the department or the lender holding the account receivable. To that end, MCL 205.54i(3) requires that a lender seeking a refund under the statute provide a written election form, specifying that it, rather than the taxpayer, may claim the refund. To claim a bad-debt deduction or refund under the statute, MCL 205.54i(2) requires that the debt must have been charged off as uncollectible in the records of the entity claiming the deduction or refund. In this case, Ally paid the dealerships the entire cost, including sales tax, of the purchased vehicles in exchange for the right to collect under the installment contracts. Ally provided election forms to the department for 2012 through 2014, which specified that Ally was entitled to claim any sales tax refunds as a result of bad debt on any and all accounts currently existing or created in the future which had been assigned from the retailer to the lender. Because accounts that are written off are still collectible and only deemed worthless for tax computation and accounting purposes, the Court of Appeals erred by holding that the accounts Ally had previously written off were not "currently existing" as stated in its election forms. Accordingly, the Court of Appeals erred by upholding the department's rejection of Ally's election forms.

Affirmed in part, reversed in part, and remanded to the Court of Claims for further proceedings.

©2018 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

FILED July 20, 2018

STATE OF MICHIGAN

SUPREME COURT

ALLY FINANCIAL INC.,

      Plaintiff-Appellee,

v                                    No. 154668

STATE TREASURER, STATE OF
MICHIGAN, and DEPARTMENT OF
TREASURY,

      Defendants-Appellants.

SANTANDER CONSUMER USA INC.,

      Plaintiff-Appellant,

v                                    No. 154669

STATE TREASURER, STATE OF
MICHIGAN, and DEPARTMENT OF
TREASURY,

      Defendants-Appellees.

SANTANDER CONSUMER USA INC.,

       Plaintiff-Appellant,

v

STATE TREASURER, STATE OF
MICHIGAN, and DEPARTMENT OF
TREASURY,

       Defendants-Appellees.

No. 154670

BEFORE THE ENTIRE BENCH

VIVIANO, J.

Plaintiffs are financing companies that seek tax refunds under Michigan's bad-debt statute, MCL 205.54i, for taxes paid on vehicles financed through installment contracts. Defendant Department of Treasury (the Department) denied the refund claims on three grounds: (1) MCL 205.54i excludes debts associated with repossessed property, (2) plaintiffs failed to provide RD-108 forms evidencing their refund claims, and (3) the election forms provided by plaintiff Ally Financial Inc. (Ally), by their terms, did not apply to the debts for which Ally sought tax refunds. The Court of Claims and the Court of Appeals affirmed the Department's decision on each of these grounds. We hold that the Court of Appeals erred by upholding the Department's decision on the first and third grounds but agree with the Court of Appeals' decision on the second ground. Accordingly, we reverse the Court of Appeals as to the first and third grounds, affirm its decision as to the second ground, and remand to the Court of Claims for further proceedings not inconsistent with this opinion.

2

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiffs, Ally and Santander Consumer USA Inc. (Santander), are financing companies seeking refunds for bad debts associated with vehicles that plaintiffs financed through installment contracts.  Santander's predecessor in interest and Ally entered into financing agreements with various auto dealerships.  Under the financing agreements, purchasers would enter into installment contracts with the dealerships under which the dealerships would finance the entire purchase price and the sales tax and remit the tax to the state.  The dealerships would then assign the installment contracts to plaintiffs in exchange for the full amount of the purchase price and sales tax.  Plaintiffs would obtain the right to collect under the contracts and repossess the vehicles upon default.

Over time, some of the vehicle owners defaulted on their installment contracts. When collection efforts failed, plaintiffs deemed a number of these agreements to be worthless and uncollectable.  Plaintiffs repossessed and resold many of the vehicles, but the sale price at times would not recoup the entire amount of the outstanding debt. Plaintiffs wrote the outstanding balances off their books as bad debts for federal income tax purposes under 26 USC 166.  Plaintiffs also filed refund requests with the Department to recoup under MCL 205.54i the prorated share of the previously paid Michigan sales tax attributable to the bad debts remaining on these accounts.

The Department denied plaintiffs' refund requests.  First, the Department determined that plaintiffs were not entitled to any refunds for debts associated with repossessed vehicles because MCL 205.54i excludes "repossessed property" from its

3

definition of bad debt.[1]  Second, the Department advised plaintiffs that they were required to support their claims with RD-108 forms, which dealers submit to the Secretary of State along with the sales tax due in exchange for a vehicle title and a validated copy of the form.  Plaintiffs argued that they generally do not have copies of this form and offered alternative documentation as to the amount of taxes paid.  The Department rejected plaintiffs' documentation and insisted that RD-108 forms were required to prove that taxes were actually paid.  Finally, the Department concluded that Ally lacked appropriate election forms designating itself, rather than the dealership, as the party entitled to claim the tax refund.

Plaintiffs first appealed the Department's decision by requesting an informal conference.  The referee at the conference recommended that the refund requests be denied, and the Department followed the recommendation.  Plaintiffs appealed this decision in the Court of Claims.  The Court of Claims granted summary disposition to defendants, agreeing that "bad debts" do not include repossessed property and that plaintiff Ally did not have valid election forms.  It also upheld the Department's decision to require the RD-108 forms, explaining that the Legislature gave the Department discretion to determine what evidence was required to support a refund claim.

The Court of Appeals consolidated plaintiffs' cases on appeal and affirmed. Regarding the proper interpretation of "repossessed property," the Court of Appeals agreed with the Department that MCL 205.54i does not permit refunds on any debts

---

[1] Both plaintiffs' refund requests involved a combination of accounts attached to vehicles that had been repossessed and accounts attached to vehicles that had not been repossessed.

4

associated with repossessed property. In reaching this conclusion, the Court looked to a prior unpublished opinion of the Court of Appeals, *DaimlerChrysler Servs of North America, LLC v Dep't of Treasury*.[2] Neither opinion, however, offered a substantive analysis of MCL 205.54i. Instead, the Court of Appeals here concluded summarily that "[t]he Department's interpretation is consistent with the plain and unambiguous language of the bad debt statute."[3] Regarding the Department's decision to require RD-108 forms, the Court of Appeals agreed with the Court of Claims that MCL 205.54i conferred discretion upon the Department to require these forms as evidence of plaintiffs' claims.[4] Finally, the Court upheld the Department's determination that the election forms provided by Ally did not satisfy the statute.[5]

Following plaintiffs' appeal in our Court, we ordered arguments on the application, directing the parties to address:

> (1) whether MCL 205.54i prohibits partial or full tax refunds on bad debt accounts that include repossessed property; (2) whether the Court of Appeals erred in giving the Department of Treasury's interpretation of MCL 205.54i respectful consideration in light of MCL 24.232(5); (3) how this Court should review the Department's decision to require RD-108 forms pursuant to MCL 205.54i(4) and, under that standard, whether the decision was appropriate; and (4) whether the Court of Appeals erred in

---

[2] *DaimlerChrysler Servs of North America, LLC v Dep't of Treasury*, unpublished per curiam opinion of the Court of Appeals, issued January 21, 2010 (Docket No. 288347).

[3] *Ally Fin, Inc v State Treasurer*, 317 Mich App 316, 337; 894 NW2d 673 (2016).

[4] *Id*. at 330-333.

[5] *Id*. at 326-330.

holding that Ally Financial's election forms did not apply to accounts written off prior to the retailers' execution of the forms.[6]

## II. STANDARD OF REVIEW

We review de novo questions of statutory interpretation.[7] While we have historically held that tax exemptions and deductions must be construed narrowly in favor of the government,[8] we have also explained "that this requirement does not permit a 'strained construction' that is contrary to the Legislature's intent."[9]

## III. ANALYSIS

MCL 205.54i permits retailers and lenders to seek a refund for sales taxes paid on a "bad debt," as defined by the statute.[10] If lenders such as plaintiffs seek the tax refund, they must provide a written election form, specifying that they, rather than the taxpayer, may claim the refund.[11] The statute further provides that any claim "shall be supported by that evidence required by the department."[12] For the reasons expressed below, we

---

[6] *Ally Fin, Inc v State Treasurer*, 500 Mich 1010 (2017).

[7] *People v Pinkney*, 501 Mich 259, 267; 912 NW2d 535 (2018).

[8] *Detroit v Detroit Commercial College*, 322 Mich 142, 149; 33 NW2d 737 (1948).

[9] *SBC Health Midwest, Inc v City of Kentwood*, 500 Mich 65, 71; 894 NW2d 535 (2017), quoting *Mich United Conservation Clubs v Lansing Twp*, 423 Mich 661, 664-665; 378 NW2d 737 (1985).

[10] MCL 205.54i is part of Michigan's General Sales Tax Act (GSTA), MCL 205.51 *et seq*.

[11] MCL 205.54i(3).

[12] MCL 205.54i(4).

hold that two of the three bases provided by the Department for rejecting plaintiffs' refund claims in this case were erroneous.[13]

## A. MEANING OF "REPOSSESSED PROPERTY" WITHIN MCL 205.54i

Determining the meaning of "repossessed property" under MCL 205.54i requires careful application of our rules of statutory interpretation. When interpreting unambiguous statutory language, "the statute must be enforced as written. No further judicial construction is required or permitted."[14] "[O]ur goal is to give effect to the Legislature's intent, focusing first on the statute's plain language."[15] We must "examine the statute as a whole, reading individual words and phrases in the context of the entire legislative scheme."[16] In doing so, we "consider the entire text, in view of its structure and of the physical and logical relation of its many parts."[17]

---

[13] This is not a case in which the Department's decision can be upheld in its entirety because it provided at least one valid basis for denying plaintiffs' claims. Instead, each basis provided by the Department only applied to a portion of the bad-debt accounts held by plaintiffs—i.e., the accounts for which plaintiffs had repossessed the vehicle, the accounts for which plaintiffs did not provide RD-108 forms, and the accounts for which Ally purportedly did not provide valid election forms. Accordingly, it is necessary to address the validity of each basis provided by the Department for rejecting plaintiffs' claims.

[14] *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014) (quotation marks and citation omitted).

[15] *Id*. (quotation marks and citation omitted).

[16] *Id*.

[17] Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 167.

7

The term "repossessed property" in MCL 205.54i is nestled within an intricate tax scheme. Consequently, its context within the GSTA is critical to uncovering its meaning. The starting point is the GSTA, which requires retailers to pay a 6% tax on all sale proceeds. The relevant statute, MCL 205.52(1), provides:

Except as provided in section 2a, there is levied upon and there shall be collected from all persons engaged in the business of making sales at retail,[18] by which ownership of tangible personal property is transferred for consideration, an annual tax for the privilege of engaging in that business equal to 6% of the gross proceeds of the business, plus the penalty and interest if applicable as provided by law, less deductions allowed by this act.

The tax is exacted based on the "gross proceeds" of businesses making retail sales. "Gross proceeds" is defined by statute to mean "sales price,"[19] which in turn "means the total amount of consideration, including cash, credit, property, and services, for which tangible personal property or services are sold, leased, or rented, valued in money, whether received in money or otherwise . . . ."[20] Thus, the tax is levied on the monetary value of the consideration a retail seller receives, whether that consideration comes in the form of money or not.

---

[18] MCL 205.51(b) defines "sale at retail" as "a sale, lease, or rental of tangible personal property for any purpose other than for resale, sublease, or subrent."

[19] MCL 205.51(1)(c).

[20] MCL 205.51(1)(d).

By its plain terms, "gross proceeds" encompasses purchases on credit.[21]  When the buyer charges on credit, the tax becomes due at the completion of the contract for purchase and not when each installment payment is made.[22]  Because the tax is due immediately, a seller may end up paying taxes on credit sales that never result in the actual receipt of any or all of the agreed upon consideration.  In such cases, the seller has paid taxes on a buyer's mere promise to pay.

The GSTA addresses this situation by creating a framework for sellers to recoup the sales tax paid based on "gross proceeds" that turn out to be worthless.[23]  MCL 205.54i(2) provides that "[i]n computing the amount of tax levied under this act for any month, a taxpayer may deduct the amount of bad debts from his or her gross proceeds used for the computation of the tax."  The statute provides the following definition of "bad debt" in MCL 205.54i(1)(a):

> 'Bad debt' means any portion of a debt that is related to a sale at retail taxable under this act for which gross proceeds are not otherwise deductible or excludable and that is eligible to be claimed, or could be eligible to be claimed if the taxpayer kept accounts on an accrual basis, as a deduction pursuant to section 166 of the internal revenue code, 26 USC 166.

---

[21] The term "credit" "refers to a charge on account, made upon the sale of the merchandise."  *Gardner-White Co v State Bd of Tax Administration*, 296 Mich 225, 233; 295 NW 624 (1941) (interpreting a prior version of the GSTA).

[22] *Id*.

[23] See *Menard Inc v Dep't of Treasury*, 302 Mich App 467, 480; 838 NW2d 736 (2013) ("[T]he bad debt provision allows taxpayers to recover overpayment when expected sales proceeds are not received.") (quotation marks and citation omitted); see also *Citizens' Acceptance Corp v United States*, 462 F2d 751, 756 (CA 3, 1972) (noting that the bad debt deduction accounts, in part, for "amounts reported as income but ultimately not collected because they became worthless").

Thus a "bad debt" is equal to whatever the seller can deduct from its federal taxes under 26 USC 166, which provides:

(a) **General rule**.—

(1) **Wholly worthless debts**.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) **Partially worthless debts**.—When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

However, MCL 205.54i(1)(a) provides the following list of specified items that are excluded from the definition of "bad debt":

A bad debt shall not include [i] any finance charge, interest, or sales tax on the purchase price, [ii] uncollectible amounts on property that remains in the possession of the taxpayer until the full purchase price is paid, [iii] expenses incurred in attempting to collect any account receivable or any portion of the debt recovered, [iv] any accounts receivable that have been sold to and remain in the possession of a third party for collection, and [v] *repossessed property*.[24]

In the present case, we have to make sense of the fifth item, "repossessed property." The statute clearly states that "repossessed property" is not part of a "bad debt" for purposes of a sales-tax refund. But what does "repossessed property" mean? Plaintiffs argue that it refers to the value of the repossessed property, while the Department interprets it as referring to the entire value of the account, i.e., the value of the account before the property was repossessed.[25] If "repossessed property" refers to the

---

[24] Emphasis added.

[25] See Revenue Admin Bull 2015-27 (noting that a taxpayer "may not claim the bad debt deduction for any amounts represented by the repossessed [property], including the amounts it did not recover in the sale"); Revenue Admin Bull 1989-61 ("The bad debt

value of the property, then the uncollectible amount not recouped from the sale of the property would remain a refundable "bad debt." If it refers to the entire account attached to the property, then there would be no "bad debt" to refund.

The Department's interpretation would, in effect, impose a sales tax on consideration that later becomes worthless—it would tax uncollectible debt. This is not a reasonable reading of the text of the statute. Rather, by referencing "repossessed property," the exclusion encompasses only what the taxpayer has collected. The text says nothing about the portion of the debt that remains uncollected, if any, after repossession. Nor does the exclusion mention the account attached to the repossessed property. Instead, it merely states "repossessed property," which indicates that only the value of the repossessed property itself is to be excluded. This makes sense in light of the definition of "bad debt" in both our statute[26] and the federal statute it relies on,[27] each of which states that "bad debt" is a portion of a debt. Accordingly, the statutes contemplate that a debt can be divisible. Thus, by including "repossessed property," but not the attached account, the statute indicates that only the portion of the debt related to the value of the repossessed property is excluded.

deduction for sales tax purposes shall not include any amount represented by the following: . . . 6. Sales tax charged on property that is subsequently repossessed.") (quotation marks omitted). We need not reach the issue of whether the bulletins were entitled to "respectful consideration" by the lower courts pursuant to *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 93; 754 NW2d 259 (2008), in light of MCL 24.232(5) because, as explained below, we find that the Department's interpretation conflicts with the plain language of the bad-debt statute.

[26] MCL 205.54i(1)(a).

[27] 26 USC 166.

This conclusion is confirmed by examining the other exclusions from "bad debt" listed in MCL 205.54i(1)(a).[28] None of these exclusions indicates that the Legislature intended in this section to impose a sales tax on consideration that becomes worthless. The first and third exclusions represent amounts on which the seller was not required to pay sales tax in the first place—"finance charge[s], interest, or sales tax" and "expenses incurred in attempting to collect" on the debts. So it would make little sense to allow a taxpayer to deduct these amounts as "bad debt."

The second and fourth exceptions, on the other hand, represent situations where a seller received full consideration or its equivalent. Under a layaway agreement, addressed by the second exception, the seller remains in possession of the property. When the buyer defaults, the seller receives the full value of the property, which it would not otherwise have retained but for the buyer's default.[29] And the full value of the property is presumably the sales price or close enough that the Legislature chose not to

---

[28] " 'If any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other.' " *Reading Law*, p 167, quoting Coke, First Part of the Institutes of the Laws of England or a Commentary upon Littleton (14th ed, 1791), p 381a.

[29] Retaining the property, which presumably has not diminished in value, may be thought of as roughly analogous to the seller having repossessed real property sold on credit and submitting a winning bid at a subsequent sale of the property for the entire amount of the outstanding debt. Cf. *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 88-89; 878 NW2d 816 (2016) (discussing the "full credit bid rule" by which a lender at the foreclosure sale successfully bids the entire remaining debt, thus extinguishing the debt). In that case, no portion of the debt remains owing. Similarly, if a layaway seller retains the item, it has essentially submitted a successful bid on the property for the full amount of the debt (or at least the full amount of the debt that arises from "gross proceeds").

allow a tax refund for any diminution in value.[30]  Similarly, when a business sells its accounts receivable, the business in exchange receives what it considers to be the fair value of the accounts from the purchaser of the accounts.  In both these scenarios, then, the taxpayer has received the equivalent of full consideration in connection with the sale.  Thus, if "repossessed property" referred to the value of the account attached to the property regardless of whether or the extent to which any consideration was actually received, it would be unlike all of the other exclusions by allowing taxation of worthless consideration.[31]

Our conclusion here is further supported by the framework set forth in the Streamlined Sales and Use Tax Agreement (SSUTA).[32]  Michigan is currently a member

---

[30] Indeed, a secured party in possession of collateral has a duty to use "reasonable care in the custody and preservation of [the] collateral . . . ."  MCL 440.9207(1).  To this end, the secured party can use the collateral "for the purpose of preserving the collateral or its value."  MCL 440.9207(2)(d).

[31] This same point can be seen through the prism of the associated-words canon (*noscitur a sociis*).  Under this interpretive principle, a statutory term must "be viewed in light of the words surrounding it."  *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002).  The canon applies when words or phrases "are associated in a context suggesting that the words [or phrases] have something in common," and "they should be assigned a permissible meaning that makes them similar."  *Reading Law*, p 195.  Here, the commonality among the other four exclusions is that none imposes a tax on worthless consideration.  As noted, the first and third exclusions account for items that never constituted taxable consideration.  And the seller in the second and fourth exclusions has received the equivalent of full consideration.  Thus, the manifest commonality among the exclusions is that they do not exclude worthless consideration.

[32] The SSUTA is a multistate compact designed to reduce the burden on out-of-state businesses of complying with state sales and use taxation.  See Galle, *Designing Interstate Institutions: The Example of the Streamlined Sales and Use Tax Agreement*, 40 UC Davis L Rev 1381, 1392-93 (2007).  The SSUTA was formed in response to *Quill Corp v North Dakota*, 504 US 298; 112 S Ct 1904; 119 L Ed 2d 91 (1992), which held that, under the current state taxation regime, the Commerce Clause requires that states

13

state under the SSUTA, and has therefore agreed to comply with the SSUTA's required provisions.[33]  Section 320 of the SSUTA requires member states to enact legislation allowing for bad-debt deductions.  That section includes a list of exclusions from the definition of "bad debt" similar to the list contained in MCL 205.54i:

> Each member state shall use the following to provide a deduction for bad debts to a seller.  To the extent a member state provides a bad debt deduction to any other party, the same procedures will apply.  Each member state shall:
>
> A.  Allow a deduction from taxable sales for bad debts.  Any deduction taken that is attributed to bad debts shall not include interest.
>
> B.  Utilize the federal definition of "bad debt" in 26 U.S.C. Sec. 166 as the basis for calculating bad debt recovery.  However, the amount calculated pursuant to 26 U.S.C. Sec. 166 shall be adjusted to exclude: financing charges or interest; sales or use taxes charged on the purchase price; uncollectable amounts on property that remain in the possession of the seller until the full purchase price is paid; expenses incurred in attempting to collect any debt, and repossessed property.[34]

---

only impose sales and use taxes on businesses that have some physical presence in the state. *Designing Interstate Institutions*, 40 UC Davis L Rev at 1389-92.  The SSUTA was drafted over a period of two years by a coalition of state legislators, state revenue department administrators, and local government officials.  Hellerstein & Swain, Streamlined Sales and Use Tax, ¶ 2.04 (2004).  Member states to the SSUTA agree to enact legislation reflecting the provisions set forth in the SSUTA. *Designing Interstate Institutions*, 40 UC Davis L Rev at 1393.

[33] See the Streamlined Sales and Use Tax Administration Act, MCL 205.801 *et seq*.  Our bad-debt statute, enacted by 1982 PA 23, predates the SSUTA, to which our state became a signatory in 2005.  And while provisions of the SSUTA that are inconsistent with our law do not have effect and may not be read as invalidating or amending any provision of our law, see MCL 205.811(1) and (5), analogous provisions of the SSUTA that are consistent with our laws are of some use in providing insight into the meaning of our statute.

[34] SSUTA, § 320.

14

This section demonstrates that the exclusions are monetary amounts that must be subtracted from "bad debt" based upon the consideration actually received. That the Legislature was focused on this correlation is further illustrated by the fact that both the SSUTA and our statute provide that if taxes on "bad debt" are refunded, but that "bad debt" is subsequently collected, the taxpayer must pay back the refunded taxes.[35]

Finally, considering how other jurisdictions handle the present issue also supports our view. Because 23 other states are members of the SSUTA, 23 other states have bad-debt provisions similar to ours. A majority of the states that have addressed this issue have agreed with the interpretation offered above.[36] Again, while these interpretations

---

[35] See MCL 205.54i(2) ("If a consumer or other person pays all or part of a bad debt with respect to which a taxpayer claimed a deduction under this section, the taxpayer is liable for the amount of taxes deducted in connection with that portion of the debt for which payment is received and shall remit these taxes in his or her next payment to the department."); SSUTA, § 320(D) ("[I]f a deduction is taken for a bad debt and the debt is subsequently collected in whole or in part, the tax on the amount so collected must be paid and reported on the return filed for the period in which the collection is made.").

[36] Nine states have clarified that only the value of the repossessed property is excluded. See Ind Code 6-2.5-6-9(d)(2) ("The amount of the deduction shall be determined in the manner provided by Section 166 of the Internal Revenue Code for bad debts but shall be adjusted to exclude: . . . (E) repossessed property.") and *SAC Fin, Inc v Indiana Dep't of State Revenue*, 24 NE3d 541, 546 (Ind Tax Ct, 2014) ("Subsection (d) requires a taxpayer to exclude amounts that reduce the original sales tax base (*i.e.*, the value of repossessed property or property still in the seller's possession) and that were not part of the original retail sales tax base (*i.e.*, interest, financing charges, sales or use tax, and debt collection expenses) from the difference between gross retail income and the amount of the federal bad debt."); Minn Stat 289A.40 ("[T]he following are excluded from the calculation of bad debt: . . . repossessed property.") and Minn Admin R 8130.7400(4) ("In the case of repossessions, an uncollectible debt deduction is allowable only to the extent that the pro rata portion of all payments and credits, attributable to the cash sales price of the merchandise is less than the net contract balance (after excluding unearned insurance and finance charges) at the date of repossession."); Neb Rev Stat 77-2708(2)(j)(*i*) ("[T]he amount calculated pursuant to 26 U.S.C. 166 shall be adjusted to

15

exclude: . . . repossessed property.") and 316 Neb Admin Code, R 1-027 ("The sales tax previously remitted by a retailer arising from the sale of property, which is subsequently repossessed, may be allowed as a credit against the retailer's current sales tax liability, but only to the extent of the portion of the purchase price remaining unpaid at the time of repossession."); Nev Rev Stat 372.368(3) ("The amount of any deduction claimed must equal the amount of a deduction that may be claimed pursuant to section 166 of the Internal Revenue Code, 26 U.S.C. § 166, for that sale minus: . . . (e) The value of any property sold that has been repossessed by the retailer."); ND Cent Code 57-39.4-21 ("However, the amount calculated pursuant to 26 U.S.C. 166 shall be adjusted to exclude . . . repossessed property.") and ND Admin Code, R 81-04.1-01-20 ("When retailers sell tangible personal property on time payments, and it becomes necessary for the retailer to repossess the tangible personal property, the transaction is handled as follows: 1. If the retailer previously included the total selling price of the tangible personal property in the retailer's gross sales and remitted tax to the tax commissioner but did not collect sales tax from the buyer, the retailer may enter a credit in the amount of the unpaid balance of the original sale."); SD Codified Laws 10-45-30 ("Bad debts do not include . . . repossessed property.") and SD Admin R 64:06:01:09 ("If repossession by the finance company becomes necessary, the retailer may deduct as a bad debt, as provided in SDCL 10-45-30, that portion of the tax previously paid, provided that in liquidation of the repossessed merchandise the retailer has actually suffered a loss and the gross receipts prove to be less than anticipated under the original contract price."); Tenn Code Ann 67-4-1030(b) ("A bad debt shall not include . . . repossessed property.") and Tenn Code Ann 67-6-507(d) ("In the event a dealer . . . be required to repossess . . . personal property at a time when the balance due on the unpaid purchase price shall exceed five hundred dollars ($500), the dealer shall be entitled to a credit on the sales tax that the dealer shall be required to collect and remit to the commissioner, in an amount equal to the difference between the amount of the sales tax collected and paid at the time of the original purchase and the amount of sales tax that would be owed on that portion of the purchase price that has actually been paid by the purchaser, plus the sales tax on the first five hundred dollars ($500) of the unpaid balance of the purchase price."); Wash Rev Code 82.08.037(2) ("For purposes of this section, 'bad debts' does not include: . . . (d) Repossessed property.") and Wash Admin Code 458-20-196 ("However, 'bad debts' do not include: . . . (iv) The value of repossessed property taken in payment of debt."); Wis Stat 77.585(1)(a) ("'Bad debt' does not include . . . repossessed property or items.") and Wis Admin Code Tax 11-30(2)(f) ("*Repossessions*. When property, items, or goods on which a receivable exists are repossessed, a bad debt deduction is allowable only to the extent that the seller sustains a net loss of the sales price upon which tax was paid.").

Three states have adopted the opposite approach. See NC Gen Stat 105-164.13 (setting forth sales tax exemptions without following the format of SSUTA, § 320) and

are not binding on our Court, they further confirm that the plain language of the provision supports interpreting "repossessed property" as the value of the repossessed property.

In sum, we hold that the term "repossessed property" encompasses only what a taxpayer has collected—that is, the value of the repossessed property—it does not refer to the entire value of the account before the property was repossessed.

## B. WHETHER THE DEPARMENT COULD REQUIRE RD-108 FORMS

Next, we must consider whether the Department properly denied a portion of plaintiffs' claims on the basis that plaintiffs did not provide validated RD-108 forms. We agree with the Court of Appeals that the Department properly exercised its discretion under the bad-debt statute by requiring that plaintiffs provide RD-108 forms evidencing the taxes paid on each vehicle. The bad-debt statute, MCL 205.54i(4), provides:

> Any claim for a bad debt deduction under this section shall be supported *by that evidence required by the department*. The department shall review any change in the rate of taxation applicable to any taxable sales by a taxpayer claiming a deduction pursuant to this section and shall

17 NC Admin Code, R 7B.3002 ("Retailers shall not deduct from their gross taxable sales the unpaid amounts on repossessed merchandise."); Ohio Rev Code Ann 5739.121 ("'Bad debt' does not include . . . repossessed property.") and Ohio Admin Code 5703-9-44(A) ("No amount can be excluded as a bad debt that represents: . . . (7) Any uncollectible amount on property repossessed by or on behalf of the vendor."); Utah Code Ann 59-12-107 ("'[B]ad debt' does not include: . . . (G) an amount that a seller does not collect on repossessed property.").

Eight states appear to have taken no position on the correct interpretation of the "repossessed property" exclusion. See Ga Code Ann 48-8-45; Iowa Code 423.21; Ky Rev Stat Ann 139.350; NJ Stat Ann 54:32B-20.1; RI Gen Laws 44-18.1-21; 10-060-33 Vt Code R 1.9780; W Va Code 11-15B-27; Wyo Stat Ann 39-15-107. Finally, three states have interpreted the "repossessed property" exclusion in SSUTA, § 320 as excluding only the expenses incurred in repossessing the property. See Ark Code 26-52-309(b); Kan Stat Ann 79-3674(b); Okla Stat, tit 68, § 1366(B)(4).

ensure that the deduction on any bad debt does not result in the taxpayer claiming the deduction recovering any more or less than the taxes imposed on the sale that constitutes the bad debt.[37]

The Department required plaintiffs to provide validated RD-108 forms supporting their claims for tax refunds. The RD-108 is an application for vehicle title and registration. The Department argues that, because the Secretary of State will only issue a validated RD-108 once sales tax is paid, the validated RD-108 provides the best evidence that the sales tax was paid and of the amount that was paid. Plaintiffs, on the other hand, argue that because the auto dealerships are the parties that originally pay the taxes, the dealerships have possession of the RD-108 forms and, in some cases, may no longer have the forms in their files. Further, while plaintiffs can obtain the forms by request from the Secretary of State, to do so would cost plaintiffs $11 per form. In light of these circumstances, plaintiffs argue that the Department acted arbitrarily and capriciously by not accepting plaintiffs' alternative documentation—plaintiffs' own spreadsheets tracking the amount of tax paid on each vehicle.

The Department in this case was given discretion by the bad-debt statute to determine the evidence required to support a party's claim for a deduction or refund.[38] When an agency is granted discretion by a statute, the agency's exercise of that discretion will be upheld if supported by a rational basis.[39] Except for the accounts for which

---

[37] Emphasis added.

[38] MCL 205.54i(4).

[39] See *Guardian Indus Corp v Dep't of Treasury*, 198 Mich App 363, 381-382; 499 NW2d 349 (1993) ("The SBTA gives the Commissioner of Revenue discretion to allow consolidation of tax returns. We will uphold the commissioner's decision not to allow

18

plaintiffs produced the RD-108 forms, plaintiffs have provided no evidence that sales taxes were actually paid. Plaintiffs provided their own internal records accounting for the payments, but these records do not show that the taxes were actually remitted. Further, while plaintiffs argue that taxes were clearly paid because the Secretary of State issued the vehicle titles, the fact that a title was issued does not conclusively establish that taxes were paid[40] and does not indicate the amount of taxes paid. As a result, plaintiffs have not shown that the Department's requirement that plaintiffs provide the validated RD-108 forms had no rational basis.[41] Accordingly, we agree with the Court of Appeals that the Department properly exercised its discretion under the bad-debt statute by requiring that plaintiffs provide RD-108 forms evidencing the taxes paid on each vehicle.

### C. WHETHER ALLY PRESENTED VALID ELECTION FORMS

Finally, we must consider the Department's determination that Ally did not present valid election forms supporting its refund claims. These forms, like all legal

---

consolidation retroactively, unless there is no rational basis for it. See *Clarke-Gravely Corp v Dep't of Treasury*, 412 Mich 484, 489; 315 NW2d 517 (1982).").

[40] For example, the vehicle purchase may be exempted from taxation. See MCL 257.815(1) ("Each application for registration . . . shall be accompanied by a statement showing the amount of the sales tax due upon the sale of the motor vehicle, . . . except *if the sale of a motor vehicle is exempt by law from the payment of the sales tax, a tax shall not be paid*.") (emphasis added).

[41] And, as noted above, plaintiffs are not left without any method of obtaining the refunds because they can obtain these forms from the Secretary of State for a reasonable cost.

texts, must be interpreted according to their plain language.[42]  We conclude that the Department's interpretation is incompatible with the plain language of the election forms.

Under MCL 205.54i, two entities can potentially claim a bad-debt refund—the retailer that remitted the sales tax to the Department or the lender holding the account receivable.[43]  The statute requires that the party seeking a tax refund for a bad debt must provide the Department with a written election document designating whether the retailer or the lender may claim the refund.[44]  MCL 205.54i(3) provides:

> After September 30, 2009, if a taxpayer who reported the tax and a lender execute and maintain a written election designating which party may claim the deduction, a claimant is entitled to a deduction or refund of the tax related to a sale at retail that was previously reported and paid if all of the following conditions are met:
>
> (a) No deduction or refund was previously claimed or allowed on any portion of the account receivable.
>
> (b) The account receivable has been found worthless and written off by the taxpayer that made the sale or the lender on or after September 30, 2009.

---

[42] *Reading Law*, p xxvii ("Our legal system must regain a mooring that it has lost: a generally agreed on approach to the interpretation of legal texts. . . .  We look for meaning in the governing text . . . .").

[43] MCL 205.54i(1)(e) (" 'Taxpayer' means a person that has remitted sales tax directly to the department on the specific sales at retail transaction for which the bad debt is recognized for federal income tax purposes or, after September 30, 2009, a lender holding the account receivable for which the bad debt is recognized, or would be recognized if the claimant were a corporation, for federal income tax purposes.").

[44] MCL 205.54i(3).

20

In this case, Ally paid the auto dealerships the entire cost, including sales tax, of the purchased vehicles in exchange for the right to collect under the installment contracts. Ally provided the Department with election forms that were executed by Ally and the dealerships between 2012 and 2014. These election documents contained the following provision designating Ally as the party entitled to claim the tax refund:

> The Retailer and the Lender agree that the Lender is the party entitled to claim any potential sales tax refunds or deductions under MCL 205.54i as a result of bad debt losses charged off after September 30, 2009, *on any and all Accounts currently existing or created in the future* which have been assigned from the Retailer to the Lender.[45]

The Department argues that because the forms only apply to accounts "currently existing or created in the future," the forms do not apply to accounts which were written off prior to the execution of the election forms. The question, then, is whether Ally's accounts written off prior to execution of the election documents were "currently existing" accounts.

Some background on when and how accounts must be written off is helpful in addressing this issue. In order to claim a bad-debt deduction or refund under the statute, the debt must have been charged off as uncollectible in the records of the entity claiming the deduction or refund.[46] MCL 205.54i(2) provides:

> In computing the amount of tax levied under this act for any month, a taxpayer may deduct the amount of bad debts from his or her gross proceeds used for the computation of the tax. *The amount of gross*

---

[45] Emphasis added.

[46] MCL 205.54i(2).

*proceeds deducted must be charged off as uncollectible on the books and records of the taxpayer* at the time the debt becomes worthless and deducted on the return for the period during which the bad debt is written off as uncollectible in the claimant's books and records and must be eligible to be deducted for federal income tax purposes.[47]

A write-off is simply an internal recognition by a lender that an account is worthless after attempts at collection have failed. As the Supreme Court of Wisconsin has explained, "When a lending institution 'writes off' a 'bad debt,' it is merely indicating that the debt is uncollectible. That is, it is no longer an asset of the institution. A 'write off' does not mean that the institution has forgiven the debt or that the debt is not still owing."[48]

Our Legislature has recognized that the debt is still owing—and may be collected—after it is written off and has required taxpayers to repay the amount deducted as bad debt on such amounts.[49] Because written-off accounts still continue to be collectible and are only deemed worthless for tax computation and accounting purposes, the Court of Appeals erred by holding that Ally's previously written-off accounts were not "currently existing" at the time that the election forms were executed.

## IV. CONCLUSION

For the reasons discussed above, we hold that the Court of Appeals erred by upholding the Department's interpretation of "repossessed property" and by upholding the Department's rejection of Ally's election forms, but we hold that the Court of

---

[47] Emphasis added.

[48] *Mitchell Bank v Schanke*, 268 Wis 2d 571, 582 n 7; 2004 WI 13; 676 NW2d 849 (2004).

[49] See MCL 205.54i(2).

Appeals properly upheld the Department's decision to require RD-108 forms from plaintiffs. Accordingly, we reverse the Court of Appeals' decision to uphold the Department's denial on the basis that the statute excludes debts associated with repossessed property and that plaintiff Ally's election forms did not apply to the debts at issue. We affirm the Court of Appeals' decision with respect to the Department's denial of a portion of plaintiffs' claims on the basis that plaintiffs did not provide validated RD-108 forms. We remand to the Court of Claims for further proceedings not inconsistent with this opinion.

David F. Viviano
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

23